UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JASON AMOS, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) 22 C 1564 |
| CITY OF CHICAGO, et al., | ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendants' Motion for Summary Judgment. For the reasons that follow, the Motion is denied.

## BACKGROUND

Plaintiff Jason Amos brings this action against the City of Chicago and Defendant Police Officers Alejandro Velez, Derrick Martin, and Gregory Smith ("Defendant Officers"). In his Complaint, Plaintiff alleges claims of unreasonable seizure, false arrest, and malicious prosecution in connection with Plaintiff's arrest on December 19, 2020. Defendants move for summary judgment on all claims.

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.[1]

On December 19, 2020, Plaintiff was a guest at the residence of Tasheika Ramsey ("T. Ramsey"), located at 18 West 114th Street in Chicago. Also present were T. Ramsey's two children, her sister, Gwendolyn Ramsey ("G. Ramsey"), and her mother, Evelyn Ramsey ("E. Ramsey"). At some point that evening, Plaintiff and E. Ramsey went outside to sit on the front porch.

Meanwhile, Defendant Officers Velez, Martin, and Smith and non-defendant Officer Diniene Cheatom[2], were on duty working as a tactical team in the area. At around 9:54 p.m., police dispatch informed the officers that a gunshot was detected by ShotSpotter.[3] The officers were assigned to respond, and dispatch provided an address of 22 West 114th Street. The officers were in full uniform and riding in the same marked SUV. They arrived at the scene approximately two to three minutes after receiving the report from dispatch.

---

[1] Any asserted facts or factual disputes that were not supported by evidence or were immaterial or otherwise inadmissible have not been included.

[2] Officer Cheatom was originally named as a defendant but the claims against him were later voluntarily dismissed with prejudice. *See* Dkt. # 29.

[3] The Seventh Circuit has described ShotSpotter as follows: "ShotSpotter is a surveillance system that uses sophisticated microphones to record gunshots in a specific area. After a device detects the sound of gunfire, it relays the audio file to a server in California, where an individual determines whether the sound is a shot. When that individual confirms the sound is a gunshot, ShotSpotter sends it back to the local police department." *United States v. Rickmon*, 952 F.3d 876, 878–79 (7th Cir. 2020).

The house at 22 West 114th Street is directly to the left and just west of T. Ramsey's home at 18 West 114th Street and the houses are separated by a gangway. The house at 22 West 114th Street has been vacant since at least February 2018. T. Ramsey estimated that the center of the gangway's pathway is approximately four feet from the porch of her residence.

At the time dispatch contacted the officers, Plaintiff and E. Ramsey were on the porch. Plaintiff testified that he heard a "faint" noise, like a little "pow," that did not sound like a gunshot, and E. Ramsey testified she did not hear anything. G. Ramsey testified that, while down in the basement, she heard a "loud sound" that was "almost like a pop," though it did not sound like a gunshot. Dkt. # 37-6, at 68. T. Ramsey testified that she heard a gunshot, but it was not close to her house. Plaintiff and E. Ramsey were the only two out on the porch; neither recalled seeing anyone else in the area.

Upon arriving at the location provided by dispatch, the officers observed Plaintiff sitting on the porch steps of the Ramsey residence, and E. Ramsey standing next to him. The officers exited their vehicle and approached the porch. Given their proximity to the location dispatch provided and the fact that they were the only ones in the area, the officers wanted to ask Plaintiff and E. Ramsey if they saw anything, if they were okay, and if they heard anything before the gunshot.

What happened next is hotly disputed. According to Plaintiff, when the officers arrived, he stood up, walked the few feet to the front door of the residence, and entered

through the front door. The officers pursued him and yanked the door open as he was trying to close it. Officer Martin entered and pushed Plaintiff farther into the house and, eventually, to the floor.

The Defendant Officers tell a much different story. Officers Velez, Martin, and Cheatom all testified that, as they exited their vehicle and approached the porch, they observed Plaintiff stand up, adjust an object in his waistband and "run" or "flee" into the house. They believed the object to be a gun. Plaintiff denies doing anything with his hands near his waist or having anything in his right hand at any point during the interaction.

Body worn camera footage from Officer Martin provides some clarity as to how the events unfolded, though not much. It is impossible to tell from the video whether Plaintiff adjusted anything in his waistband after standing up. It is clear, however, that Plaintiff was not "running" into the house. As Plaintiff was moving into the house, Officer Smith shouted at him to "come back."

Officer Martin pursued Plaintiff, followed by the other officers. Officer Martin's body worn camera footage shows Plaintiff attempting to pull the security door closed behind him, but Martin manages to grab the door before it's pulled closed. He reaches for Plaintiff but is unable to grab him. At 2:10 into the Martin video, you can see Plaintiff's right hand flat on the door—there's nothing in his hand. At 2:11, Plaintiff is in the entryway of the house, has his hands up, and is facing Martin. His right hand is empty; he has a cell phone in his left hand. Martin attempts to detain Plaintiff by

4

grabbing Plaintiff's hands, but at 2:12, Plaintiff turns away from the officers and continues moving farther into the house. At 2:14, Martin's right hand can be seen on Plaintiff's arm as Plaintiff continues to move farther into the house, either on his own or by force. The video goes dark for several seconds. At 2:28, you can see Plaintiff face down on the ground with his right arm extended into the space between pillows on the couch.

The view of Plaintiff's arm is then obstructed by the other officers. Officer Velez's body worn camera footage shows Officer Martin pulling Plaintiff's left arm behind Plaintiff's back—before Plaintiff ends up on the ground.

At around 2:18 into the Velez video, Plaintiff's right hand can be seen extended into the space between some pillows on the couch, and his left hand is on top, holding a cell phone.

Plaintiff claims Officer Martin pushed him farther into the residence; Officer Martin says he did not. The two are about the same size and weight. Plaintiff also claims that upon entering the house the officers had control of both Plaintiff's hands as the officers pushed him further into the house until they fell. Officer Martin also asserts that, as Plaintiff was fleeing from him, Plaintiff tripped over an object on the floor and fell. Officer Martin testified that he did not trip or fall onto the couch and did not touch Plaintiff besides their right hands overlapping. As Plaintiff was on the floor, Officer Velez assisted in attempting to gain control of Plaintiff's hands but was only able to grab Plaintiff's left hand.

According to Officer Martin, as Plaintiff was falling, he observed an object in Plaintiff's right hand, which was going towards the couch. He could not tell what the object was at that time. Officer Martin followed Plaintiff's right hand into the couch and recovered a firearm. Plaintiff vehemently denies ever possessing a gun and denies that his hand was ever in the couch. The video at this point is obscured; none of this can be seen in the footage. The firearm Martin reportedly recovered was a two toned semiautomatic F.I.E. Titan .25 Caliber handgun, small enough to fit inside a person's hand. The weapon was not loaded and did not contain a magazine.

When Plaintiff and the other officers come back into view, at 2:30 into the Martin video, Officer Martin says "I got it, I got it." While Officers Velez and Smith work to secure Plaintiff, Officer Martin walks through the rooms to the front door and back to where Plaintiff is being handcuffed. Upon reentering the room, at 2:56, Martin leans over and puts his right hand on the arm of the couch and reaches towards one of the officers with his left hand. There is nothing in his left hand. There is no gun in the picture between the time Officer Martin said, "I got it," and when he rejoined the officers at 2:56. Officer Martin testified that he immediately took precautions to make sure the firearm was safe by performing a visual and physical inspection of the gun but conceded that none of the body worn camera footage shows a gun.

Once Plaintiff was securely handcuffed, Officers Martin and Smith stood him up and escorted him out of the house. While being escorted out of the home, Plaintiff admitted he was a convicted felon. He was placed under arrest.

6

T. Ramsey testified she did not see a gun on Plaintiff at that time or at any point that night, she did not know him to carry a gun, she did not own a gun, and she would never allow a gun in her home. E. Ramsey testified she did not have a gun, had never seen T. Ramsey or G. Ramsey with a gun, and believes neither woman would leave a firearm in the house with children. G. Ramsey also testified that she did not own a gun and did not see any guns in the house that day.

The State's Attorney approved charges for one count of Unlawful Use of a Weapon by a Felon at 11:57 p.m. on December 19, 2020. On January 12, 2021, the case was presented to a grand jury and Plaintiff was indicted on two counts of armed habitual criminal, and three counts of unlawful use of a weapon by a felon. Plaintiff was on felony probation at the time of his arrest on December 19, 2020, and could not violate any criminal statutes or possess firearms. Officer Velez testified before the grand jury.

On August 30, 2021, a hearing was held on a motion to quash and suppress evidence. Officers Martin and Velez testified. The judge granted the motion, finding that the officers lacked sufficient probable cause to enter the Ramsey residence without a warrant and arrest Plaintiff.

Following the suppression of the handgun, Plaintiff's charges were dismissed via *nolle prosequi* on September 10, 2021. Plaintiff was in custody from December 19, 2020, until September 10, 2021.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Video evidence "can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

# DISCUSSION

## I. Fourth Amendment Unreasonable Seizure Claim

Plaintiff argues that the Defendant Officers violated his Fourth Amendment rights because they lacked a reasonable basis for an investigatory stop.

The Fourth Amendment allows officers to briefly detain and stop a person for investigative purposes—even where probable cause is lacking—if the officer has a reasonable suspicion based on articulable facts that criminal activity may be occurring. *United States v. Segoviano*, 30 F.4th 613, 619 (7th Cir. 2022) (citations omitted). "Reasonable suspicion" embodies less than probable cause or even a preponderance of the evidence, but more than a hunch. *Id.* An investigatory detention may be justified by a reasonable suspicion that the person is, is about to, or was engaged in criminal activity. *Id.* (citations omitted).

Because the Fourth Amendment "only protects against unreasonable searches and seizures," *United States v. Mays*, 819 F.3d 951, 955 (7th Cir. 2016), the Court's "first task is to ascertain the point[s] at which Fourth Amendment concerns became implicated," *United States v. Ford*, 333 F.3d 839, 844 (7th Cir. 2003), and next to assess whether any violations occurred. Here, the parties dispute when Plaintiff was actually seized. In Plaintiff's view, Plaintiff was seized the moment that Officer Martin entered the residence "and immediately grabbed Plaintiff." Dkt. # 43, at 3. Defendants, on the other hand, argue Plaintiff was not seized until he was detained inside the residence on the floor next to the couch.

A seizure occurs within the meaning of the Fourth Amendment "if, in the totality of the circumstances, a reasonable person would not feel free to disregard the police and move along." *United States v. Howell*, 958 F.3d 589, 597 (7th Cir. 2020) (cleaned up). "A Fourth Amendment seizure is 'not a continuous fact'; it is a single act that occurs at a discrete point in time." *Mays*, 819 F.3d at 955–56 (quoting *California v. Hodari D.*, 499 U.S. 621, 625 (1991)). There are two kinds of seizures: "those effected through physical force and those effected through a show of authority and submission to the assertion of the authority." *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011). This case involves a seizure through the use of physical force. In such cases, there is a seizure "[w]henever an officer restrains the freedom of a person to walk away," *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), such as by the "laying on of hands or [other] application of physical force, even . . . unsuccessful[ly]," *Hodari D.*, 499 U.S. at 626. *See also Mays*, 819 F.3d at 956 ("[A] fleeing suspect—even one who is confronted with an obvious show of authority—is not seized until his freedom of movement is terminated by intentional application of physical force or by the suspect's submission to the asserted authority.").

It's difficult to tell from the videos the exact point Officer Martin first made physical contact with Plaintiff in an attempt to detain him. *See Torres v. Madrid*, 141 S. Ct. 989, 999–1003 (2021) (the application of physical force with the intent to restrain constitutes a Fourth Amendment seizure regardless of whether the detainee submits to that force; however, "a seizure by force—absent submission—lasts only as long as the

10

application of force"); *Hess v. Garcia*, 72 F.4th 753, 763 (7th Cir. 2023) ("Physically grabbing someone is likely to be a seizure because it is likely to restrict movement, at least briefly.").

Martin did try to detain Plaintiff immediately upon entering the home but appears to have been unsuccessful. So, it's possible Plaintiff was not seized as early as Plaintiff contends. Martin pursued Plaintiff deeper into the house, either by, as Plaintiff claims, pushing Plaintiff into the house, or because Plaintiff was fleeing, as Defendants claim. Officer Martin's body worn camera footage shows that Officer Martin at least had his hand on Plaintiff's right arm *before* Plaintiff fell to the floor next to the couch. And Officer Velez's body worn camera footage appears to show Officer Martin pulling Plaintiff's left arm behind Plaintiff's back—also before Plaintiff was on the floor. So, Defendants may be incorrect as well with respect to the timing of the seizure. *See Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020) (the physical contact by the officer grabbing the suspect's shoulder was the moment police first seized him).

Defendants argue that Martin's body worn camera footage "completely contradict[s]" Plaintiff's claims about the timing of the seizure. We disagree; "[t]his is certainly not the rare case where the video definitively demonstrates what occurred." *See Kailin*, 77 F.4th at 482. In short, the video evidence is too inconclusive to grant summary judgment. Granting summary judgment would require inappropriate resolution of inferences in Defendants' favor rather than Plaintiff's favor. *See Gupta v. Melloh*, 19 F.4th 990, 998 (7th Cir. 2021) (reversing a grant of summary judgment

11

where reasonable jurors could have many different and opposing conclusions about what they saw in video evidence).

Because questions of material fact exist as to the timing of the initial seizure, which directly affects the reasonable suspicion analysis and whether Plaintiff's constitutional rights were violated, Plaintiff's unreasonable seizure claims must be resolved at trial.

## II. Fourth Amendment False Arrest Claim

Plaintiff next challenges the lawfulness of his arrest and subsequent pretrial detention. Probable cause is an absolute defense to claims under Section 1983 against police officers for an allegedly unreasonable seizure, whether a false arrest or a wrongful pretrial detention. *See Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015); *Crowder v. Barrett*, 2023 WL 3145312, at *3 (7th Cir. 2023) ("Arrest and detention are seizures under the Fourth Amendment and therefore must be justified by probable cause for their entire duration."). And because probable cause is an objective standard, Plaintiff's arrest was lawful if the officers had probable cause to arrest him for any offense, regardless of the reason the police were called or the reason given for the arrest. *See*, *e.g.*, *Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004); *Norris v. Serrato*, 761 F. App'x 612, 615 (7th Cir. 2019); *Sroga v. Weiglen*, 649 F.3d 604, 608 (7th Cir. 2011) ("The existence of probable cause to arrest a suspect for any offense, even one that was not identified by the officers on the scene or in the charging documents, will defeat a Fourth Amendment false-arrest claim.").

12

Whether an arrest is supported by probable cause is usually a question of fact decided by the jury. *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714 (7th Cir. 2013). However, if the underlying facts are undisputed, the Court can make that decision on summary judgment. *Id.* Here, though, it is hotly disputed whether a gun was actually recovered from where Defendants claim it was recovered (if one was recovered at all), and therefore a question of material fact exists as to whether the officers had probable cause to arrest Plaintiff for possession of a firearm.

Defendants briefly argue that because Plaintiff refused to comply with Officer Smith's command to "come back here," the officers had probable cause to arrest Plaintiff for obstructing (or resisting) a peace officer. Plaintiff, however, points out that questions of fact preclude a determination of whether the officers had reasonable suspicion for a *Terry* stop, and it is disputed as to whether Plaintiff was "fleeing" from the police. In Plaintiff's version of events, he walked calmly into the house and was pushed further inside by Officer Martin until he was forced to the floor. The body worn camera footage does not conclusively contradict this claim. And, while Officer Smith may have ordered Plaintiff to come back, it is not clear from the record that Plaintiff actually heard that command. In sum, it is for a jury to decide which version of events to credit, and so Defendants' motion for summary judgment is denied with respect to Plaintiff's false arrest claim.

### III. Fourth Amendment Malicious Prosecution Claim

The Fourth Amendment governs both detentions that happen before and after the legal process begins. *See Manuel v. City of Joliet*, 580 U.S. 357, 366–67 (2017); *see also Kuri v. City of Chicago*, 990 F.3d 573, 575 (7th Cir. 2021). Unlawful pretrial detention occurs when either "the police hold someone without any reason before the formal onset of a criminal proceeding," or when "legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Manuel*, 580 U.S. at 367.

Plaintiff argues that his detention after his arraignment violated his Fourth Amendment rights, and so brings a claim for malicious prosecution under Section 1983. *See Thompson v. Clark*, 142 S. Ct. 1332, 1337 (2022). Such claims require that the prosecution was instituted without probable cause, that the motive in bringing the charge(s) was "malicious," and that the prosecution terminated in favor of the accused. *Id.* at 1338.

In the context of a malicious prosecution claim, courts consider whether probable cause existed at the time of charging, not at the time of arrest. *Holland v. City of Chicago*, 643 F.3d 248, 254 (7th Cir. 2011). For purposes of such a claim, probable cause exists where the facts "would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013). This is a slightly higher standard than the probable cause required to defeat a false arrest

claim under Section 1983, which only requires that "the totality of the facts and circumstances known to the officer at the time of arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime. *Abbott*, 705 F.3d at 714.

Granting summary judgment in Defendants' favor on Plaintiff's malicious prosecution claim would require accepting the Defendant Officers' version of events as true and disregarding Plaintiff's version of events. This we cannot do. Defendants claim Plaintiff was in possession of a firearm, and Plaintiff claims he never had a gun and no gun was ever recovered. At summary judgment, the Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart*, 14 F.4th at 760.

## IV.   State Law Malicious Prosecution[4]

Because, as explained above, summary judgment is inappropriate on Plaintiff's federal malicious prosecution claim, it is also inappropriate with respect to his state law malicious prosecution claim.

## V.   Punitive Damages

Defendants also move to strike Plaintiff's request for punitive damages. The Court declines to do so at this time.

---

[4] Plaintiff concedes there is insufficient evidence to conclude that Officer Smith had sufficient personal involvement in Plaintiff's prosecution and agrees to dismiss this claim as to Officer Smith only. Summary judgment is therefore granted in Officer Smith's favor on Plaintiff's state law malicious prosecution claim.

15

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment [36] is denied. Telephonic status hearing is set for 3/14/24 at 10:15 a.m.

It is so ordered.

_____
Charles P. Kocoras
United States District Judge

Dated: February 15, 2024